UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re                                                                                 Chapter 7

GEORGE MITSOPOULOS
a/k/a GEORGE A. MITSOPOULOS,                                   Case No. 11-41911

               Debtor.
----------------------------------------------------------------x
RICHARD PU,                                                                   Adv. Proc. No. 11-1391-CEC

               Plaintiff,

    -against-

GEORGE MITSOPOULOS,

               Defendant.
----------------------------------------------------------------x

## DECISION

APPEARANCES:

Richard Pu  
120 E. 90th Street, 10C  
New York, NY 10128  
Plaintiff Pro Se

Gregory M. Messer  
Law Office of Gregory Messer  
26 Court Street, 24th Floor  
Brooklyn, NY 11242  
Attorney for the Defendant

CARLA CRAIG  
Chief United States Bankruptcy Judge

Richard Pu ("Plaintiff") brought this adversary proceeding objecting to the discharge of George Mitsopoulos (the "debtor") pursuant to § 727(a) of Title 11, U.S.C. (the "Bankruptcy Code").[1] This decision follows a trial held on the issue of whether the debtor's discharge must be denied under § 727(a)(3) based upon the debtor's failure to keep or preserve recorded information relating to his business, a pharmacy which closed during the year before he filed for bankruptcy. Because the records produced by the debtor are insufficient to allow parties in interest to ascertain the debtor's financial condition, and because the debtor has not shown that the failure to keep or preserve records was justified, the debtor is denied a discharge pursuant to § 727(a)(3).

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1996, as amended by order dated December 5, 2012. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(J). This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

The debtor is a licensed pharmacist who owned and operated a retail pharmacy through his wholly owned corporation, Titan Pharmaceuticals & Nutrition, Inc. ("Titan"), from 1998 through June, 2010. Titan was a franchisee of Medicine Shoppe, Inc. until 2009, and thereafter operated independently under the name Health First, until it ceased doing business in June, 2010.

---

[1] Unless otherwise indicated, all statutory citations are to provisions of Title 11, U.S.C.

Plaintiff represented the debtor and Titan in litigation with Medicine Shoppe from December, 2004 through June, 2006, and holds a claim for unpaid legal fees, which the debtor disputes.

The debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code on March 11, 2011. In his bankruptcy, the debtor seeks to discharge over $2 million in unsecured claims, over $1.3 million of which is listed as business debt. On July 14, 2011, Plaintiff filed the instant adversary proceeding seeking a judgment denying the debtor a discharge pursuant to § 727(a)(2)-(6). A trial was held on November 29, 2012 on Plaintiff's objection to discharge based on the debtor's failure to keep or preserve records under § 727(a)(3). At that trial, direct testimony was provided by affidavit, with witnesses available for cross-examination.

Plaintiff contends that pursuant to § 727(a)(3), the debtor is not entitled to a discharge because the debtor concealed or failed to keep or preserve business records of Titan sufficient to allow parties in interest to ascertain the debtor's financial condition. The debtor counters that the information contained in his and Titan's bank statements; certain documents prepared by his accountant, consisting of a transaction journal and two types of general ledgers prepared from Titan's bank statements; and various other documents introduced at trial, provide sufficient information to allow parties in interest to ascertain his and Titan's financial condition and business transactions. The debtor further contends that even if the records are insufficient, his failure to keep or preserve Titan's records is justified because his accountant approved of his record-keeping practices; because he believed that as a defunct corporation, Titan was not obligated to maintain additional records; and because certain records of Titan were disposed of by the tenant who took occupancy of Titan's business premises after Titan turned over possession to the landlord, before he had an opportunity to retrieve them.

The principal records produced by the debtor at trial are contained in a 162-page exhibit

consisting of a set of documents, dated on the last day of each month from December 2007 through February 2010, with the title "All Journal Transactions," and two general ledgers for each quarter from December 2007 through March 2010, one labeled "General Ledger Detail," and the other labeled "General Ledger Trial Balance." (Ex. D-3a). The document entitled "All Journal Transactions" is a transaction journal that sets forth monthly cumulative debits and credits for general categories of transactions, including, among other items, purchases, general expenses, cash, inventory and loan balances. (Ex. D-3a at 1-33). The documents entitled "General Ledger Detail" provide three-month cumulative totals and account balances for these categories of transactions. (Ex. D-3a at 34-130). The documents entitled "General Ledger Trial Balance" provide a summary of the numbers provided in the General Ledger Detail. (Ex. D-3a at 131-162).

The debtor's accountant, Michael Smith, testified that he used information provided by the debtor to create the journal and general ledgers, but did not independently evaluate or audit the information provided. See Affidavit of Michael Smith ("Smith Aff.") ¶ 3. Both he and the debtor testified that the debtor provided him with cancelled checks and bank statements once a month. (Tr. 69:24-25[2]; Affidavit of George Mitsopoulos ("Debtor Aff.") ¶ 9). Mr. Smith then prepared handwritten journals, which were not introduced at trial, "within a couple of days" of receiving the statements and cancelled checks. (Tr. 75:13-16). Mr. Smith agreed with the characterization of the handwritten journals as similar to a "copy of Titan's checkbook register." (Tr. 144:6-8). Thereafter, "about once every three months," Mr. Smith prepared the transaction journal on the computer, which he described as summaries of information contained in the handwritten journals and certain information obtained from other sources. (Tr. 75:17-20; 135:8-

---

[2] "Tr." refers to the transcript of the trial held on November 29, 2012.

15). As Mr. Smith put it, "I'm taking like transactions and putting them together. So, if he issues a hundred checks for purchases of material, it all gets summarized into one total. One total gets posted to the computer." (Tr. 135:19-22). Mr. Smith explained that the documents entitled "General Ledger Detail," containing the same categories of transactions on a quarterly basis, posted the prior journal summary to the "accounts that they belong to," and was created for the purpose of preparing Titan's sales tax and income tax returns. (Tr. 139:5-7, 20-23). Finally, in the "General Ledger Trial Balance," the numbers from the general ledger were "summarized and totaled, and it shows the opening balance before adjustments, whatever transpired in the period that was accounted for, and then ending balance in the final column." (Tr. 141:19-24).

Mr. Smith testified that other information recorded in the journals, which could not be ascertained through the bank statements and cancelled checks, was obtained through other means. For example, the amount of inventory in the store was communicated to him orally by the debtor, after a physical inventory count, "at least once a month" (Tr. 68:2-69:3; 131:16-25). Loan balances were ascertained by obtaining written end-of-year statements from each creditor detailing the loan activity for the year. (Tr. 128:10-129:16).

According to Mr. Smith, all original documents, including bank statements and cancelled checks, were returned to the debtor. (Tr. 143:1-20). However, the only documents introduced at trial to substantiate the transactions summarized in the journals were Titan's bank statements covering the last six months that Titan was in business: the period from January through July of 2010, and October of 2010. (Ex. C). These bank statements show deposits and withdrawals from the account, but do not contain information regarding the sources of the deposits or the recipients of checks drawn on the account. None of the corresponding cancelled checks from the Titan bank account were provided.

Mr. Smith testified that he prepared Titan's corporate tax return, as well as returns for its sales and payroll taxes. (Tr. 142:7-13). While certain sales and payroll tax returns were submitted, along with some supporting documentation (Exs. D-5, D-7, D-9), only one corporate income tax return was produced, for 2004 (Ex. D-1). Mr. Smith testified that the underlying documents used to prepare the tax returns were also returned to the debtor. (Tr. 142:20-21).

Unaudited balance sheets and income statements for Titan were also introduced, for year-end 2006, 2007, and 2008, with an accompanying letter dated November 6, 2009 (Ex. D-3d); and balance sheets and income statements for year-end 2009 and February 28, 2010, with an accompanying letter dated May 5, 2010 (Ex D-3e); and a proforma balance sheet as of March 31, 2010, with a handwritten notation stating that it was emailed on May 17, 2010. (Ex. D-3g). Mr. Smith testified that these documents were likely prepared in connection with loan applications. (Tr. 115:14-15; 121:23-25; 124:15-17).

The debtor also introduced various other documents, including the debtor's personal bank statements from 2010 and 2011 (Exs. A, B); a schedule of Titan's debts from early 2010 (Ex. D-2); e-mails relating to the debtor's attempt to obtain a loan for Titan dated May 2010 (Ex. D-2); Titan bank statements for an account with Valley National Bank for December 2009 and January 2010 showing a balance of $1.00 (Ex. D-2); a quarter-page summary listing salaries and taxes of Titan, dated June 30, 2010 (Ex. D-3b); an amortization schedule for a loan from March 2006 (Ex. D-4); documents relating to Titan's workers compensation and disability insurance (Ex. D-6); a check to Fist Health Pharmacy dated December 16, 2010 (Ex. D-8); several documents indicating Titan's 1099 income for 2008 and 2009, including letters from the New York State Senior Prescription Plan indicating amounts paid to Titan, and 1099 forms from the New York State Department of Health, "NHIC, Corp," and United Healthcare insurance company (Ex. D-

8); some W-2 forms (ex. D-9); certain tax worksheets (Ex. D-9); and certain other undated notes. The relevance of these documents to ascertaining the debtor's or Titan's financial condition was not explained.

On cross-examination, Plaintiff confronted both Mr. Smith and the debtor with two versions of what appears to be a corporate tax return for Titan from 2000, one showing a loss of $89,469 and the other showing a loss of $1,469 (Plaintiff Exs. 1, 50). The debtor testified that the tax return showing a loss of $89,469 was submitted to the IRS, and that the other return was not submitted to the IRS. (Tr. 167:24-168:7). Mr. Smith testified that both were prepared by his firm, that the return showing a loss of $1,469 contains false numbers, but that he did not recall why or when it was prepared. (Tr. 102:11-104:18) Although the debtor testified that he did not recall the purpose for which the second tax return was prepared, the debtor acknowledged that when confronted with the two tax returns in an earlier arbitration proceeding, he testified that "at times when I would fall behind, I'd need to take out a loan and I might need to show something a little bit better to be approved for the loan. No one is going to give me a line of credit with a negative $89,000 -- $89,000 income loss." (Tr. 170:18-20; 172:3-10).

The debtor testified that most of Titan's business activities involved filling prescriptions, but that he also "sold a few dry goods here and there." Debtor Aff. ¶ 8. Ninety percent of his revenue came from Medicaid, Medicare, and other insurance companies, 7% through credit card and check transactions, and 3% in cash. Debtor Aff. ¶ 8. The debtor testified that "revenues were used to pay for expenses like professional fees, inventory, rent and utilities, and the wages of [his] part time employees." Debtor Aff. ¶ 10.

The debtor testified that he often used his personal finances to keep Titan in business, by loaning money to Titan, using personal property as collateral for business loans, and signing as a

personal guarantor for Titan's debts. Debtor Aff. ¶¶ 10, 11. To satisfy a judgment obtained by Titan's franchisor against Titan, the debtor also borrowed money from his parents. Debtor Aff. ¶ 16. No documents were introduced to substantiate any of these loans. Eventually, because Titan could not satisfy its obligations and could not obtain a new loan, Titan ceased operations. Debtor Aff. ¶ 19.

When Titan closed in June 2010, the debtor "turned over the keys to the location to the landlord, and [he] left." Debtor Aff. ¶ 19. The debtor testified that at that time he abandoned the store, he left "crates and filing cabinets…containing invoices, correspondence, and personal papers, and some business records for Titan," but that "[b]ecause Titan was a defunct corporation, and because my accountant had already prepared the most recent financial statements for it, I didn't think I needed to keep the invoices I left behind." Debtor Aff. ¶ 20. The debtor further explained that "[b]y the time I went back to get them in August [of 2010], they had already been discarded by the new tenant's contractors. See Debtor Aff. ¶ 20. On cross examination, the debtor further elaborated that because he left a "fully functioning pharmacy," and "[a]nyone who wanted to walk into that store and open up a pharmacy, they didn't have to spend five cents;" he "was fairly sure" that the next tenant would operate a pharmacy at that location, and therefore he did not think that the new tenant would dispose of Titan's records. (Tr. 156:1-16; 157:7-11).

As to the nature of the records left behind, the debtor testified that "nothing that was left behind was necessary to determine Titan's financial condition. Rather, they were documents necessary for the operation of the business." Debtor Aff. ¶ 21.

> Specifically, there were items left in the basement and items left in some cabinets on the first floor. The items in the basement were all kept in large, green, waterproof totes. They were: every

> prescription the store ever filled from 1998 through 2010; every
> bill the store ever received from wholesalers from 1998 through
> 2010; register receipts from 1998 through 2010; seasonal
> merchandise and holiday decorations; and extra inventory. Upstairs
> in filing cabinets there was a 2-drawer cabinet in the back
> containing all the third-party and wholesaler contracts Titan
> entered into; a 2-drawer cabinet in the front containing the current
> invoices due, the newest controlled-substance invoices, the store
> licenses, Titan's Medicaid agreement, and order forms; and a 4-
> drawer cabinet that was newer, so mostly empty- the top drawer
> contained all the documents I ever received regarding the issues
> with the Plaintiff, the second drawer contained my personal papers,
> and the other two were empty.

Debtor Aff. ¶ 21.  However, the debtor also testified that some of the supporting documents for Titan's tax returns, as well as Titan's bank statements and corresponding check images, were left in the store and disposed of.  (Tr. 164:23-165:2; 206:24-207:2).

## DISCUSSION

A. Denial of Discharge Under § 727(a)(3)

Section 727(a)(3) of the Bankruptcy Code provides that:

> (a) The court shall grant the debtor a discharge, unless --
> (3) the debtor has concealed, destroyed, mutilated, falsified, or
> failed to keep or preserve any recorded information, including
> books, documents, records, and papers, from which the debtor's
> financial condition or business transactions might be ascertained,
> unless such act or failure to act was justified under all of the
> circumstances of the case.

"The fundamental policy underlying §727(a)(3) is to insure that the trustee and the creditors receive sufficient information to enable them to trace the debtor's financial history, to ascertain the debtor's financial condition, and to reconstruct the debtor's business transactions." Helms v. Gangemi (In re Gangemi), 291 B.R. 242, 246 (E.D.N.Y. 2003).  "If a debtor fails to

produce records, sufficient to meet the burden placed upon him by § 727(a)(3), the Court must deny the discharge." Id. at 246.

To determine whether a debtor's discharge must be denied under § 727(a)(3), a court must apply a two-step analysis. In re Cacioli, 463 F.3d 229, 235 (2d Cir. 2006). First, the party objecting to discharge has the burden to show that the debtor "has failed to keep and maintain adequate books and records, and that such failure renders it impossible to discern the debtor's true financial condition and identify material business transactions." McCord v. Sethi (In re Sethi), 250 B.R. 831, 838 (Bankr. E.D.N.Y. 2000) (citing Krohn v. Cromer (In re Cromer), 214 B.R. 86, 98 (Bankr. E.D.N.Y. 1997)). Although this initial burden lies with the plaintiff, the debtor is obligated to produce the financial records in the first place. See Gangemi, 291 B.R. at 246. Second, "[i]f the creditor shows the absence of records, the burden falls upon the bankrupt to satisfy the court that his failure to produce them was justified." Cacioli, 463 F. 3d at 235.

B. Adequacy of the Records Produced

"It is up to the bankruptcy court's broad discretion to determine on a case by case basis whether the records produced by the debtor are sufficient." Sethi, 250 B.R. at 838 (citing Krohn v. Frommann (In re Frommann), 153 B.R. 113, 117 (Bankr. E.D.N.Y.1993)). "The debtor is not required to keep an impeccable system of bookkeeping, or to maintain records so complete that he can satisfy an expert in business." Id. at 838. Rather, the test is whether there is available written evidence made and preserved from which the debtor's present financial condition, and his recent business transactions for a reasonable period in the past, may be ascertained with substantial completeness and accuracy. Id. (citing Barristers Abstract Corp. v. Caulfield (In re Caulfield), 192 B.R. 808, 823 (Bankr. E.D.N.Y. 1996). Additionally, "a debtor cannot simply place sacks of records before the bankruptcy judge or trustee and request the judge or trustee to

sift through the documents and attempt to reconstruct the flow of the debtor's assets." Frommann, 153 B.R. at 118.

In addition to the information contained in the available financial records, courts may also consider: (1) whether the debtor was engaged in business, and if so, the complexity and volume of the business; (2) the amount of the debtor's obligations; (3) whether the debtor's failure to keep or preserve books and records was due to the debtor's fault; (4) the debtor's education, business experience and sophistication; (5) the customary business practices for record keeping in the debtor's type of business; (6) the degree of accuracy disclosed by the debtor's existing books and records; (7) the extent of any egregious conduct on the debtor's part; and (8) the debtor's courtroom demeanor. Frommann, 153 B.R. at 117.

The documents produced by the debtor concerning Titan's business are insufficient to allow parties in interest to ascertain the debtor's business transactions. Courts have consistently held that in order to adequately ascertain a debtor's financial condition, particularly where the debtor operated a business during the relevant time period, the debtor must provide documents from which individual business transactions can be identified and substantiated. See Rossi v. Moreo (In re Moreo), No. 07–8256–478, 2009 WL 2929949 at *7 (Bankr. E.D.N.Y. Sept. 10, 2009) (monthly handwritten journals containing the monthly total cash receipts and disbursements for the debtor's retail bagel store insufficient to satisfy § 727(a)(3) because the journals did not contain separate entries for daily or weekly receipts and disbursements, the debtor did not provide receipts or other information to support the entries, and the entries could not be reconciled with the business's bank statements); In re Juzwiak, 89 F.3d 424, 428 (7th Cir. 1996) (checking account ledgers, canceled checks, bank statements, and an income tax return for a single year for debtor's business insufficient to satisfy § 727(a)(3) because the records "did not

disclose the source of the funds deposited and additionally because there is no substantiation of expenses"); Vetri v. Meadowbrook Mall Co., 174 B.R. 143, 145 (M.D. Fla. 1994) (bank statements and cancelled checks that did not reveal the "source of the deposits [or] the use of the monies withdrawn" insufficient to determine accurate financial condition of the debtor under § 727(a)(3)); see also Cromer, 214 B.R. at 98 (plaintiff must show that failure to maintain adequate records "renders it impossible to…identify material business transactions").

Here, the documents produced at trial do not allow parties in interest to identify or substantiate Titan's individual business transactions. Titan's transaction journal reflects the cumulative effects of Titan's business activities on its accounts during a given month, but does not identify the individual transactions that comprise these totals, identify the dates when the transactions occurred, or even the number of transactions that occurred during that period. The two types of general ledgers provide even more generalized information for quarterly periods. Neither do the balance sheets or income statements provide information concerning individual business transactions. The bank statements introduced at trial reflect less than six months of Titan's operations before it went out of business in June of 2010, which does not cover a "reasonable period in the past." See Sethi, 250 B.R. at 838. Moreover, the statements that were provided do not identify the sources of deposits, and because the debtor did not provide cancelled checks corresponding to the transactions on the bank statements, it is impossible to ascertain the purposes for or disposition of funds withdrawn from the account.

Additionally, tax returns and their supporting documentation are considered necessary to ascertain a debtor's financial condition. See Schackner v. Breslin Realty Dev. Corp., , No. 11–CV–2734, 2012 WL 32624 at *5 (E.D.N.Y. Jan. 5, 2012) ("Courts in the Second Circuit have consistently denied discharge…when certain categories of documents essential to determining a

debtor's history are missing–specifically, tax returns and their underlying financial records.") (collecting cases). Here, the debtor failed to produce any of Titan's corporate income tax returns other than its return for 2004, more than six years before the debtor filed for bankruptcy. Furthermore, to the extent the debtor may have included certain underlying documentation for the tax returns as exhibits at trial, the relevance of those documents was not explained, and cannot practically be used to ascertain the debtor's financial condition without reference to the actual tax returns.

Consideration of the eight factors enumerated in Frommann also leads to the conclusion that the debtor failed to keep or maintain adequate records. The debtor owned and operated a retail pharmacy, which is a complex business that engages in many transactions on a daily basis; the debtor's petition lists over $2 million in unsecured claims, over $1.3 million of which relates to the debtor's business; while the debtor's justifications for failing to produce records will be addressed below, it is undisputed that many of the debtor's documents concerning Titan were destroyed because the debtor failed to remove them upon surrendering the premises to the landlord; the debtor is a licensed pharmacist, which requires an advanced degree, and operated a retail pharmacy for approximately twelve years; although no evidence was introduced regarding the customary record-keeping practices for retail pharmacies, the debtor has not provided basic documents such as cancelled checks or tax returns, which any business would be expected to maintain; and while the accuracy of the records that were produced cannot be determined without their underlying documentation, their accuracy is questionable in light of the debtor's admission that he and his accountant fabricated an inaccurate tax return in an effort to obtain a loan for Titan. Even absent a finding that the debtor engaged in egregious conduct, or a negative assessment of his courtroom demeanor, it is clear that the debtor has not provided adequate

books and records to allow parties in interest to ascertain the financial condition of the debtor or his business.

### C. The Debtor's Justifications

Because the records in this case are insufficient to satisfy § 727(a)(3), it is necessary to examine the debtor's claimed justifications for his failure to maintain adequate records of his business. "Once the court determines that the records produced by the debtor are insufficient to enable the court, the trustee or the creditors to determine the debtor's financial affairs and business transactions, the burden shifts to the debtor to justify any deficiencies." Gangemi, 291 B.R. at 246. "[W]hether a debtor's failure to keep books is justified is a question in each instance of reasonableness in the particular circumstances." Cacioli, 463 F.3d at 235 (internal quotations omitted).

"Debtors have a duty to preserve those records that others in like circumstances would ordinarily keep." Sethi, 250 B.R. at 839 (citing Caulfield, 192 B.R. at 823). "Hence, the debtor's honest belief that he does not need to keep the records in question, or that his records are sufficient, or his statement that it is not his practice to keep additional records, does not constitute justification for failure to keep or preserve records under § 727(a)(3)." Id. (citing In re Pimpinella, 133 B.R. 694, 698 (Bankr. E.D.N.Y. 1991)). "If the debtor's transactions were such that others in like circumstances would ordinarily keep financial records, then [the debtor] must show more than that '[he] did not comprehend the need for them and must carry [his] explanation by way of justification to the point where it appears that because of unusual circumstances [he] was under no duty to keep them.'" Frommann, 153 B.R. 113, 117, (citing In re Sandau, 151 F.2d 807, 809 (2d Cir. 1945)).

In short, whether the debtor's failure to keep records was justified must be determined in

light of all the circumstances of the case. Cromer, 214 B.R. at 99. The court should consider the debtor's education, experience, the sophistication of the debtor's business, the debtor's personal financial structure, and any special circumstances that may exist. See Id.; Caulfield, 192 B.R. at 823. A sophisticated debtor is generally held to a higher level of accountability in record keeping, and the more complex the debtor's financial situation, the more numerous and detailed the debtor's financial records should be. Id.

Here, the debtor's asserts that his failure to keep and produce Titan's records is justified (1) because his accountant approved of his record-keeping practices; (2) because he believed that as a defunct corporation, Titan was not obligated to maintain additional records; and (3) because the records were disposed of by his landlord or by the new tenant before he had an opportunity to retrieve them. None of these justifications satisfies the debtor's burden.

The debtor's first asserted justification, that his accountant approved of his record-keeping practices, is not supported by the record. There was no testimony or other evidence indicating that Mr. Smith advised the debtor that it was not necessary for him to keep Titan's bank statements, cancelled checks, tax returns, and supporting documentation. Mr. Smith testified that all original documents used to prepare the transaction journal and tax returns were returned to the debtor, presumably for the debtor to maintain them, not to dispose of them. (Tr. 142:20-21; 143:1-20) ("original client records, I return to the client"). Moreover, it is unreasonable for a person with the debtor's professional education and business experience to consider it unnecessary to maintain such basic documents as bank statements, cancelled checks, tax returns, or any documents identifying or substantiating Titan's day-to-day business transactions.

Nor is the debtor's second asserted justification, that he believed that as a defunct

corporation, Titan was not obligated to maintain records, sufficient to satisfy the debtor's burden. As noted above, a debtor's honest belief that he does not need to maintain records does not constitute justification for failure to keep or preserve records under § 727(a)(3). See Sethi, 250 B.R. at 839 (citing Pimpinella, 133 B.R. at 698); See also Frommann, 153 B.R. at 117 (a debtor "must show more than that she did not comprehend the need [to maintain documents]"). Moreover, given that the debtor was personally liable for a significant portion of Titan's debts, his contention that he did not understand the need to preserve Titan's financial records once it was no longer in business is difficult to credit.

Finally, the debtor's claim that the lack of records is justified because records of Titan were disposed of by a third party before he had the opportunity to retrieve them must also be rejected. According to the debtor's direct testimony, "nothing that was left behind was necessary to determine Titan's financial condition." Debtor Aff. ¶ 21. Although the debtor later testified on cross-examination that some of the supporting documents for Titan's tax returns, as well as Titan's bank statements and corresponding check images, were left in the store and disposed of, this testimony was contradicted by the debtor's earlier testimony, and the debtor did not specify which documents were left behind. (Tr. 164:23-165:2; 206:24-207:2). Thus, the conclusion that the debtor's failure to produce adequate records was due to the destruction of records left in the store is not supported by the record. Moreover, the fact that the debtor waited two months after leaving the premises before he attempted to retrieve those records undermines his attempt to rely on the destruction of records as justification. Such a delay of any efforts to safeguard Titan's records is not reasonable, notwithstanding the debtor's statement that he "was fairly sure" that the next tenant would operate a pharmacy at that location, and that the records would be preserved until he retrieved them. (Tr. 157:7-11). For these reasons, the debtor has not carried

his burden to justify his failure to provide adequate records.

## CONCLUSION

For the reasons set forth above, the debtor is denied a discharge pursuant to § 727(a)(3). Because the debtor's discharge must be denied under § 727(a)(3), it is not necessary to decide whether discharge should be denied based on other grounds. A separate order and a judgment will issue.



**Dated: Brooklyn, New York**
**March 8, 2013**

_____
**Carla E. Craig**
**United States Bankruptcy Judge**